***********
Upon review of the competent evidence of record with reference to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence or to rehear the parties or their representatives, the Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 *********** *Page 2 
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. On November 28, 2005, an employment relationship existed between Employee and Employer.
2. On November 28, 2005, Employer was insured by Penn National Insurance Company for purposes of the Workers' Compensation Act.
3. Employee's average weekly wage was $419.86, which yields a compensation rate of $279.92.
4. The parties stipulated to the Pre-trial Agreement as stipulated exhibit 1 and medical records, discovery responses, and Industrial Commission forms as stipulated exhibit 2.
5. The issues for resolution are as follows:
 A. Whether Plaintiff sustained a compensable injury by accident on or about November 29, 2005.
 B. If so, whether Plaintiff's stroke in December, 2005, was causally related to the injury by accident.
 C. If so, to what benefits is Plaintiff entitled.
 * * * * * * * * * * *
Based upon the competent and credible evidence of record, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. Plaintiff was born on September 27, 1937, and at the time of hearing before the Deputy Commissioner he was 70 years of age. He dropped out of school before he reached high school. His work history includes some work as a mechanic and work as a truck driver for Defendant-Employer. Plaintiff has no work experience that does not involve manual labor. For several years prior to November, 2005 Plaintiff was treated for diabetics and hypertension.
2. Plaintiff was employed by Defendant-Employer, Earp's Wholesale Seafood, as a truck driver for approximately 30 years. His job required him to run a weekly delivery route on which he delivered seafood to stores from Raleigh to Augusta, Georgia. He drove a 6-wheeler truck, with a van body that functioned as a cooler. Generally, Plaintiff's route began Sunday evening, and he returned home on Tuesday evening.
3. The boxes of seafood Plaintiff delivered weighed approximately 50 pounds. There was no lift on the back of the truck Plaintiff drove, so he manually loaded and unloaded the boxes. In making deliveries, he would stack boxes on a hand truck and roll them into the customer's cooler.
4. On or about Tuesday, November 29, 2005, Plaintiff was delivering seafood in Hamlet, North Carolina, the final stop on his route. He was inside the truck moving boxes with a hand hook. One of the boxes ripped, and he fell and struck his head against the metal side of the van. Plaintiff does not recall whether he lost consciousness. He sat for a few moments to collect himself and was then able to unload the boxes of seafood onto the curb. Plaintiff drove home and arrived at approximately 7:00 p.m. He told his wife about his fall and complained that his head was hurting. Plaintiff's testimony is found to be credible. Plaintiff's fall was an unusual and unforeseen occurrence, which arose out of and in the course of his employment. *Page 4 
5. On the following day, Wednesday, Plaintiff was not able to go to work because his head hurt. Instead, he remained bedridden all day. His wife took the paperwork and money from his deliveries to Earp's Seafood. Although conflicting testimony has been offered, the Full Commission finds that Plaintiff's wife notified his supervisor, George Earp, Plaintiff had fallen in the van and explained that he would not be able to work that day.
6. On Thursday, December 1, 2005, Plaintiff presented to his previously scheduled appointment with his primary care physician, Dr. Marjorie Debnam of the Debnam Clinic, with complaints of a headache. Plaintiff's blood pressure was measured at 220/120, and Dr. Debnam admitted him to WakeMed hospital for hypertensive crisis. Plaintiff was admitted to WakeMed on December 1, 2005 so that his blood pressure could be monitored and brought under control. He remained hospitalized for monitoring purposes, but was scheduled to be discharged on December 10, 2005. During his stay, his blood pressure was kept under control.
7. On December 10, 2005, Plaintiff's wife was assisting him to the bathroom of his hospital room when he slumped onto her, lost control of his speech, and began drooling. He became groggy and lethargic and had weakness on the left side. Dr. Debnam was called, and after examining Plaintiff, she ordered a CT scan of his head.
8. Dr. W. Kent Davis reviewed the CT scan taken on December 10, 2005 and provided the following report: "The initial head CT reveals a linear area of increased density along the right side of the cerebral falx, extending inferiorly to the tentorium, coursing along the tentorium, particularly on the right. This is consistent with blood in the subdural space. No parenchymal (brain soft tissue) blood is identified. There is mild mass effect with some compression of the right side of the brain, resulting in a smaller lateral ventricle on the right." The falax is the membrane that divides the right and left hemispheres of the brain and the *Page 5 
tentorium is the membrane at the back of the brain that separates the occipital lobe from the cerebellum.
9. A second CT taken on December 12, 2005 showed no change. The CT taken on February 17, 2005 showed resolution of the blood and resolution of the mass effect. It also showed a resulting infarction in the occipital lobe. A Brain MRI taken on December 11, 2005 showed the subdural hematoma and the infarction or contusion in the right occipital lobe which was not evident on the CT scan taken the prior day. Dr Davis noted that the blood appearing on the initial CT and Brain MRI was consistent with blood that was recent in age, between minutes old and several weeks old.
10. Following the CT scan, Dr. Susan Glenn of Raleigh Neurology was called for a consultation. Upon physical examination, Dr. Glenn noted that Plaintiff had difficulty following multi-step commands and answering simple math problems. Plaintiff had mild field cut on the left, i.e., he had difficulty focusing on the left side of his field of vision. He also had mild weakness on the left side. Dr. Glenn reviewed the CT scan, noted Plaintiff's history of a recent fall, and attributed the mental status changes to the subdural hematoma. She recommended a neurosurgical examination and further observation.
11. On December 11, 2005, Plaintiff's condition worsened significantly. He had very poor mental status and was very lethargic. He also exhibited hemiparesis, or weakness on one side of the body, in his left leg and left arm. An MRI scan was taken, which revealed a right occipital lobe stroke. The area of the stroke was directly adjacent to the blood in the tentorium and the falax.
12. On December 20, 2005, Plaintiff was discharged from WakeMed and admitted to WakeMed Rehabilitation Hospital. While at the rehabilitation hospital, Plaintiff underwent *Page 6 
physical, occupational, and speech therapies. Plaintiff remained hospitalized at WakeMed Rehabilitation until January 20, 2006, during which time he exhibited some improvement in the left-sided hemiparesis and in his ability to speak and answer questions.
13. After his discharge from WakeMed Rehabilitation, Plaintiff received his follow-up care at Raleigh Neurology Associates and has made some progress in his functional abilities. On April 11, 2007, he reached maximum medical improvement. On that date, he had slow fine motor coordination on the left side, difficulty getting out of a chair, atrophy in his left quadriceps, and mild left hemiparesis. He used a cane for ambulation. These functional limitations are permanent.
14. On February 20, 2008, the parties took the deposition of Dr. Susan Glenn of Raleigh Neurology Associates. Dr. Glenn was tendered as an expert in neurology. Dr. Glenn testified to a reasonable degree of medical probability and the Full Commission finds as fact, that both the subdural hematoma and the stroke (infarct) suffered by Plaintiff were directly related to the accident he suffered at work on November 29, 2005. The subdural hematoma resulted directly from the trauma of Plaintiff striking his head against the side of the truck. The blood from the subdural hematoma led to mass effect, or increased pressure on the brain tissue. The pressure caused external compression of the blood vessel which led to the stroke. Dr. Glenn was aware of Plaintiff's risk factors for stroke when she gave her opinion. Dr. Glenn also testified that because of the residual deficits associated with Plaintiff's fall, subdural hematoma, and stroke, he is unable to return to competitive employment. Specifically, Plaintiff has persistent, residual left-sided weakness, he continues to have slow fine motor skills, and he walks with a cane. *Page 7 
15. On February 25, 2008, the parties took the deposition of Dr. W. Kent Davis of Raleigh Radiology. Dr. Davis was tendered as an expert in neuroradiology, which is a subset of radiology where the doctor has expertise in evaluating the brain and the spinal column and cord. Dr. Davis testified that his practice involves reviewing scans to diagnose and determine the etiology of brain injuries. Dr. Davis was consulted to evaluate several CT scans and the MRI of Plaintiff to confirm the diagnosis of stroke and to give an opinion on causality. Dr. Davis opined to a reasonable degree of medical certainty and the Full Commission finds as fact that Plaintiff's stroke was directly caused by the subdural hematoma Plaintiff suffered. Dr. Davis testified that the blood from the hematoma was present in the falax and the tentorium, membranes in the brain adjacent to the occipital lobe where the stroke occurred. He testified that the skull, the tentorium, and the falax are all hard structures and when blood is introduced into the space between these structures and the brain tissue, the tissue is squeezed. According to Dr. Davis, when the brain tissue is squeezed, the pressure goes up and makes it more difficult for the blood to travel through the vessels and oxygenate the tissue and feed the brain; and, when blood flow and oxygenation decreases, that is how the stroke occurs.
16. On February 19, 2008, the parties took the deposition of Dr. Wayne Smith of Rex Healthcare. Dr. Smith was tendered as an expert in internal and vascular medicine. He is medical director of heart and vascular diagnostics and generally provides consultations rather than treatment. Approximately ten (10%) of his patient consults involve stroke patients. He sees many patients with subdural hematomas but he does not provide direct consultations and he testified that he "would not be the consultant to give an opinion about a subdural." Dr. Smith did a records review of Plaintiff's stipulated medical records and opined that Plaintiff's stroke was more likely than not caused by chronic hypertension, wholly independent of the subdural *Page 8 
hematoma. He felt the subdural happened around the time Plaintiff fell, but it did not cause the stroke. When asked whether there is any way to tell if the subdural hematoma led to the stroke, he replied: "Well, I don't know. I mean, the way that I looked at this and is — well, the answer is I don't know — and . . . I don't know if there's not a neuroradiologist that does brain MRI's and can't go back through those images and perhaps answer that question. That's beyond the scope of me." He questioned whether the findings were consistent with a closed head injury versus an ischemic stroke. He later testified he disagreed with the opinion of Dr. Davis, the neuradiologist.
17. On March 19, 2008, the parties took the deposition of Dr. Marjorie Debnam of the Debnam Clinic. Dr. Debnam is a doctor of general internal medicine. She testified that the stroke was caused by a clot and was not related to the subdural hematoma. The reliability of Dr. Debnam's medical notes and testimony has reasonably been called into question.
18. After considering all of the medical evidence, the Full Commission gives greater weight to the opinions of Dr. Davis and Dr. Glenn over those of Dr. Smith and Dr. Debnam.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On November 29, 2005, Plaintiff sustained a compensable injury to his head and brain arising out of and in the course of his employment with Defendant-Employer due to a fall. Plaintiff's fall constituted an unusual and unforeseen occurrence and was an accident under the Act. N.C. Gen. Stat. § 97-2(6).
2. As a direct result of hitting his head on the metal side of the van when he fell, Plaintiff sustained a right-sided subdural hematoma which led to his stroke on December 10, 2005. Terry *Page 9 v. PPG Industries, Inc., 156 N.C. App. 512, 577 S.E.2d 326 (2003),review denied by, 357 N.C. 256, 583 S.E.2d 290 (2003).
3. As a direct result of his work-related head and brain injuries, Plaintiff has been totally disabled since December 10, 2005. "The term `disability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C. Gen. Stat. § 97-2(9). The burden is on the employee to establish both the existence and the degree of disability.Hall v. Thomason Chevrolet, Inc., 263 N.C. 569, 139 S.E.2d 857 (1965). The employee may prove disability in one of four ways:
 (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury.
Russell v. Lowes Prod. Distrib., 108 N.C. App. 762, 765, 425 S.E.2d 454,457 (1993). Plaintiff has met his burden of proving disability by presenting medical evidence that he is not presently capable of work in any employment.
4. The treatment that Plaintiff has received to date for his head and brain injuries was reasonably necessary to effect a cure, provide relief, or lessen the period of his disability. Plaintiff is entitled to have Defendants pay for all medical treatment — including paid, unpaid, and unreimbursed medical expenses — that Plaintiff has received to date as a result of the head and brain injuries he suffered due to his injury by accident. Plaintiff needs continuing medical treatment. Defendants are obligated to pay for all medical treatment related to the head and brain *Page 10 
injuries Plaintiff received or receives in the future that is reasonably necessary to effect a cure, give relief, or lessen the period of Plaintiff's disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Defendants shall pay Plaintiff total disability benefits pursuant to N.C. Gen. Stat. § 97-29 at the rate of $279.92 per week effective December 10, 2005 and continuing until further order of the Industrial Commission.
2. Defendants shall pay all medical compensation — including paid, unpaid, and unreimbursed medical expenses — incurred or to be incurred by Plaintiff for treatment of the compensable injuries, for so long as such treatment may be reasonably required to effect a cure, give relief, or lessen the period of disability.
3. A reasonable attorney fee of 25% of the indemnity compensation awarded to Plaintiff herein is approved for counsel for Plaintiff. From the compensation already accrued, this attorney's fee shall be deducted from the amount due Plaintiff and paid directly to counsel for Plaintiff. Thereafter, counsel for Plaintiff shall receive every fourth check.
4. Defendants shall pay the costs.
This the ___ day of December 2008.
 S/_________________________
 BERNADINE S. BALLANCE
 COMMISSIONER *Page 11 
CONCURRING:
 S/_________________________ BUCK LATTIMORE COMMISSIONER
 S/_________________________ DIANNE C. SELLERS COMMISSIONER